Lillian EPSTEIN, Individually and as Ex'x of Estate of Hyman Epstein, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Morris EPSTEIN and Becky Epstein, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Fred EPSTEIN, Plaintiff,

v.

UNITED STATES of America, Defendant.

Norman EPSTEIN and Miriam Epstein, Plaintiff,

v.

UNITED STATES of America, Defendant.

Paul ELLIS and Arlene Ellis, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Isaac EPSTEIN and Sarah Epstein, Plaintiffs,

v.

UNITED STATES of America, Defendant.

William EPSTEIN and Becky Epstein, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Sylvia EPSTEIN and Sylvia Epstein, Ex'x of Estate of Isaac Epstein, Deceased, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. Nos. 35710–35717.

United States District Court
N. D. Ohio, E. D.
Sept. 20, 1963.

**480**

Ulmer, Berne, Laronge, Glickman & Curtis, Cleveland, Ohio, Richard Katcher and Bruce L. Newman, Cleveland, Ohio, of counsel, for plaintiffs.

Solomon Fisher, Sp. Atty., Tax Division, Department of Justice, Washington, D. C., and Merle M. McCurdy, U. S. Atty., Cleveland, Ohio, for defendant.

GREEN, District Judge.

These eight actions were brought for recovery of income taxes for the year 1951, and have been consolidated for trial. The plaintiffs were all partners in the Epstein Construction Company.[1] The total amount sought to be recovered by plaintiffs is $24,777.32, plus statutory interest.

The issue before the Court is whether two corporations in which plaintiffs had an interest were "collapsible corpora-

tions" as that term is defined in § 117 (m) of the Internal Revenue Code of 1939.

One corporation was known as Euclid Gardens, Inc., and was owned and controlled by plaintiffs. As to that corporation the issue is the application of § 117 (m) to the gains realized by plaintiffs on the sale of their stock in said corporation.

The second corporation was known as Park-Lawn Gardens, Inc., in which plaintiffs owned 50% of the stock. With respect to this corporation the issue involved is the application of § 117(m) to the gains realized by the plaintiffs in the distribution of cash by said corporation to the plaintiffs as shareholders.

Plaintiffs reported their gains on the two transactions in question as capital gains for tax purposes and paid their taxes for 1951 accordingly. Thereafter deficiencies were assessed against them on the basis that the gains were taxable as ordinary income, and plaintiffs paid the deficiencies as assessed. It is plaintiffs' claim that the deficiencies were erroneously assessed and collected, and that they are entitled to a refund thereof.

By reason of the fact that the refund claimed by plaintiffs herein involves two different corporations, that is, Euclid Gardens, Inc., and Park-Lawn Gardens, Inc., the Court has determined to set forth the relevant facts as to each corporation separately.

### EUCLID GARDENS, INC.

Plaintiffs herein were all partners in the Epstein Construction Company, which partnership was organized on January 1, 1949, and was successor in interest to a partnership formerly known as Epstein & Son. This company had been in the residential building construction business since the year 1920. The Epstein Construction Company consisted of eight members of the Epstein family, with Hyman Epstein, now deceased, being the senior partner.

---

1. One plaintiff is executrix of the estate of a deceased partner; the wives of other partners are named as party plaintiff by reason of the filing of joint tax returns.

In the early part of 1949 the partners in Epstein Construction Company decided to construct a multiple dwelling project in the City of Euclid, Ohio, containing 303 apartments.

Euclid Gardens, Inc., was organized on March 28, 1949, and incorporated under the laws of the State of Ohio. The stated purpose of the corporation was as follows:

"To acquire, develop, construct, erect, hold and rent real estate for the purpose of producing rental income and the doing of all things necessary or incident thereto."

The original stock authorized was 250 shares no par, and five of the partners of Epstein Construction each purchased one share of stock in the corporation, for a total consideration of $1,000.00.

On April 29, 1949 Euclid Gardens' Articles of Incorporation were amended so as to authorize issuance of the following classifications of stock:

100 shares of preferred stock with a par value of $1.00 per share, to be sold for $1.00;

250 shares Class A Common with a par value of $5.00 per share to be sold for $1,000.00 cash and that of the amount received for each share $5.00 be allotted to stated capital and $995.00 be allotted to paid-in surplus;

50 shares Class B Common without par value to be sold at $25.00 per share and that of the amount received for each share $12.50 be allotted to stated capital and $12.50 be allotted to paid-in surplus.

The purpose clause of the corporation was also amended, the pertinent parts reading as follows:

"The purpose or purposes for which it is formed and the business and objects to be carried on and promoted by it are as follows:

"(a) To create a private corporation to provide housing for rent or sale, and to acquire any real estate or interest or rights therein or appurtenant thereto and any and all personal property in connection therewith.

"(b) To improve and operate and to mortgage or lease any real estate and any personal property.

"(c) To borrow money and issue evidence of indebtedness in furtherance of any or all of the objects of its business; to secure the same by mortgage, deed of trust, pledge or other lien. * * *"

Euclid Gardens, Inc., obtained a Federal Housing Administration mortgage insurance commitment in the amount of $2,366,700, and obtained a loan in that amount from the National City Bank of Cleveland, which loan was evidenced by a note and secured by a mortgage on the property of the corporation. All of the authorized preferred stock was issued to the Federal Housing Administration, as required by Section 608 of the National Housing Act.

226 shares of Class A common stock were subscribed for by five of the partners of Epstein Construction for a consideration of $226,000. 209½ shares of this subscription were taken in the name of Hyman Epstein. This subscription was recorded on the corporation's books as of May 31, 1949. On that same date the five partners subscribed for 40 shares of Class B common for $1,000.00.

All of the shares of Class A and Class B stock were cancelled as of December 30, 1949, and were reissued to all eight partners in the partnership equally. The members of the Epstein family were the officers and directors of Euclid Gardens, Inc., Hyman Epstein being President, and Paul Ellis Secretary.

Euclid Gardens, Inc., entered into a contract with the Epstein Construction Company on May 2, 1949, whereby the construction company was to build for Euclid Gardens, Inc., a 303-suite apartment project on its property located in Euclid, Ohio, with the minimum construction cost to be $2,225,000 and the maximum cost to be $2,320,322. Con-

struction was to commence within 30 days from date of the agreement and was to be completed by September 30, 1950. On May 19, 1949 building permits to construct the apartment were obtained from the City of Euclid. Thereafter, in the latter part of May of 1949, construction of the project was commenced. Some of the suites in the Euclid Gardens apartments first became available for occupancy in the early part of November, 1949. From time to time the F.H.A. certified that various suites in the project were ready for occupancy. The last letter of authorization for occupancy in the project was obtained from the Federal Housing Administration on April 20, 1950.

A few days prior to March 6, 1950 Hyman Epstein, President of Euclid Gardens, Inc., had a conversation with a Mr. Harry Ratner with reference to the sale of the project to the said Harry Ratner. Thereafter, on May 5, 1950, a written contract was entered into with Harold Hirschfield (a partner of and agent for Harry Ratner) for the sale of the Class B common stock of said Euclid Gardens, Inc. This contract was the culmination of the conversation and agreement between Harry Ratner and Hyman Epstein first had with reference to the sale of the project a few days prior to March 6, 1950. The contract of sale provided that the unpaid balance of the purchase price was to be paid on January 10, 1951, and provided that all prorations and adjustments were to be made as of October 31, 1950. The contract also provided in Paragraph 6(f) that the project was to be completed in accordance with the requirements of the Federal Housing Administration by the closing date. Pursuant to the terms of the contract of sale, the plaintiffs received a check for $15,000 as a down payment from the buyers.

On October 31, 1950 an entry was made on Euclid Gardens' books and records with reference to redemption of the 226 shares of its Class A common stock then outstanding, and that stock then was redeemed on December 29, 1950 by the payment to Epstein Construction Company of the sum of $225,367.20. On January 12, 1951 the members of the Epstein family were replaced as officers and directors of Euclid Gardens, Inc., by the nominees of Harold Hirschfield and Harry Ratner. Thereafter, on January 17, 1951, the plaintiffs received the balance of $63,297.05 from Harold Hirschfield and Harry Ratner for the sale of Class B stock.

The records indicated that the Epstein Construction Company made a gross profit on the construction of the project of $291,794.84, and this profit was reported as ordinary income by the partnership in its partnership returns for the years 1949 and 1950.

The plaintiffs admitted that as of April 20, 1950, at the time they obtained authorization for occupancy of the last of the suites in the project, several of the suites were not rented, that they required the last coat of paint which was to be selected by the tenant, and also required the installation of hardware. Evidence also was submitted to indicate that all of the offsite improvements on the project had not been completed on May 5, 1950. The request for the final advance of funds on the construction loan was not made until November 15, 1950.

Of the total amount received by the partnership for the sale of stock in Euclid Gardens, Inc., $76,563.27 was reported on the partnership's return of income for 1951 as long-term capital gain.

### PARK-LAWN GARDENS, INC.

Park-Lawn Gardens, Inc., an Ohio corporation, was organized on August 19, 1949, for the purpose of constructing a 502-suite apartment project to be located in Euclid, Ohio. The purpose of forming the corporation, as set forth in the purpose clause, reads as follows:

"To create a private corporation to provide housing for rent or sale, and to acquire any real estate or interest or rights therein or appurtenant thereto, and any and all personal property in connection therewith."

The Articles of Incorporation authorized Park-Lawn Gardens, Inc., to have outstanding 500 shares of stock which were classified as follows:

100 Preferred shares with a par value of $1.00 per share, to be sold for $1.00.

350 Class A Common shares with a par value of $5.00 per share, to be sold for $1,000 cash and that of the amount received for each share $5.00 be allotted to stated capital and $995.00 be allotted to paid-in surplus.

50 Class B Common shares without par value, to be sold at $25.00 per share.

Park-Lawn Gardens, Inc., obtained a Federal Housing Administration commitment in the amount of $4,003,900 and obtained a loan in that amount from the National City Bank of Cleveland, which loan was evidenced by a note and secured by a mortgage on the corporate property.

All of the authorized preferred stock of Park-Lawn Gardens, Inc., was issued to the Federal Housing Administration as required by Section 608 of the National Housing Act.

In September and October, 1949, Max Ratner deposited $210,000 into Park-Lawn Gardens, Inc. This amount was treated as a loan from Max Ratner to the Epstein Construction Company, and 210 shares of Class A common stock in Park-Lawn Gardens, Inc., were issued to Hyman Epstein as nominee for the partnership, Epstein Construction Company. $110,000 of the loan from Max Ratner to the Epstein Construction Company was subsequently discharged by the transfer of 110 shares of Class A common stock of Park-Lawn Gardens, Inc., by Hyman Epstein as nominee for the Epstein Construction Company to Max Ratner and his nominees. Hyman Epstein retained the remaining 100 shares of Class A common stock on behalf of the Epstein Construction Company.

With reference to the Class B common stock of Park-Lawn Gardens, Inc., 25 shares were issued to Epstein Construction Company for the sum of $625.00 and 25 shares were issued to Max Ratner and his nominees for $625.00.

During the period under consideration the directors of the corporation were Hyman Epstein, Isadore Epstein and Frank H. Feingold (attorney for Max Ratner), and during that same period the officers of said corporation were Hyman Epstein, President, Frank H. Feingold, Secretary, and Paul Ellis, Treasurer.

Park-Lawn Gardens, Inc., contracted with Epstein's Inc., a corporation which had been organized on July 26, 1949, and which was owned 50% by the Epstein family and 50% by the Max Ratner family, for the construction of the 502-suite apartment project on the property of Park-Lawn Gardens, Inc. The building contract provided for a minimum construction cost of $3,448,738 and a maximum cost of $3,658,738. The construction of the Park-Lawn Gardens project was begun in October of 1949.

The first suites in the project became available for occupancy on or about May 19, 1950. The last suite approved for occupancy by the Federal Housing Administration was on September 5, 1951. This suite had been used as an office by the corporation and permission to occupy the last previous suite had been granted by the F.H.A. on March 20, 1951.

On June 29, 1951, there was a meeting of the Board of Directors of Park-Lawn Gardens, Inc., authorizing the redemption of 160 shares of Class A common stock at $1,000 per share. On June 30, 1951 and October 31, 1951 entries were made on Park-Lawn's books and records reflecting the redemption of 160 shares of Class A Common stock at $1,000 per share.

On June 30, 1951, the Board of Directors voted to write up the assets of the corporation, which were carried on its books at cost, to an amount equalling the estimated replacement costs of such assets as determined by the F.H.A. This write-up resulted in an excess of $551,-

466.37 over the amount at which these assets were previously carried on the books of the corporation. Further, the stated value of Class B common stock was increased by $551,466.37.

On September 10, 1951, the Board of Directors of Park-Lawn Gardens, Inc., voted to transfer the $551,466.37 from capital to earned surplus. That sum was to be put aside for distribution to the Class B common shareholders. At the same meeting the Board of Directors of Park-Lawn authorized the distribution of $85,000 to its Class B shareholders at the rate of $1,700 per share. This distribution was subsequently made to Max Ratner individually and Hyman Epstein, on behalf of the Epstein Construction Company, each receiving $42,500.

On September 24, 1951, redemption of the remaining 50 shares of Class A common stock outstanding at $1,000 per share was authorized, to be made on September 29, 1951. Journal entries reflecting that transaction were entered on the books of the corporation on November 30, 1951.

Between May of 1950 and October of 1951, Park-Lawn Gardens, Inc., had a gross profit from rentals of more than $168,646.88. However, the corporation's income tax returns for the years 1950 and 1951 show no taxable earnings.

The partnership's (Epstein Construction Company) income tax return for the year 1951 reported the $42,500 received from Park-Lawn Gardens, Inc., on the distribution to holders of Class B stock as $39,719.01 long-term capital gain, and the balance, or $2,780.99, was reported as dividends received.

The Government claims that the $39,719.01 which was reported as capital gain was ordinary income. Deficiencies were assessed against the plaintiffs, the amount was paid, and claims for a refund have been timely filed.

Section 117(m) of the Internal Revenue Code of 1939 with reference to collapsible corporations, in pertinent part, is as follows:

"§ 117. *Capital gains and losses*
"(m) *Collapsible corporations.*

"(1) *Treatment of gain to shareholders.* Gain from the sale or exchange (whether in liquidation or otherwise) of stock of a collapsible corporation, to the extent that it would be considered (but for the provisions of this subsection) as gain from the sale or exchange of a capital asset held for more than 6 months, shall, except as provided in paragraph (3), be considered as gain from the sale or exchange of property which is not a capital asset.

"(2) *Definitions.*

"(A) For the purposes of this subsection, the term 'collapsible corporation' means a corporation formed or availed of principally for the manufacture, construction, or production of property, for the purchase of property which (in the hands of the corporation) is property described in subsection (a) (1) (A), or for the holding of stock in a corporation so formed or availed of, with a view to—

"(i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the net income to be derived from such property, and

"(ii) the realization by such shareholders of gain attributable to such property."

Section 117(m) was enacted to deal with loopholes in the law and directed against certain schemes in tax avoidance, developed especially by those in the motion picture and construction industries. The specific evil sought to be cured by this section was the so-called "collapsible" corporation and the conversion into capital gain of what would

otherwise be ordinary income resulting from the manufacture, construction or production of property. The enactment of this statute was to prevent a long-term capital gain where the sale of corporate stock or a distribution was made to shareholders prior to the realization by the corporation of a substantial portion of net income to be derived from the manufacture or construction of properties.

In reviewing § 117(m) for the purpose of determining the existence of a collapsible corporation, the following essentials are required under said section:

1. That the corporation was formed principally for the manufacture, construction or production of property.

2. That the property was manufactured, constructed or produced by the corporation.

3. That the construction of the property was substantial in relation to other activities of the corporation.

4. That a sale of stock by shareholders or a distribution to shareholders occurred prior to a realization by the corporation of a substantial part of net income to be derived from said property.

5. That there was a realization by the shareholders of a gain attributable to the property.

6. That the corporation was formed or availed of with a view to the sale or exchange of stock by its shareholders, or a distribution to its shareholders, prior to the realization by the corporation of a substantial part of the net income to be derived from property constructed by said corporation.

Plaintiffs have admitted all of the foregoing essential elements of a collapsible corporation, with regard to both Euclid Gardens, Inc., and Park-Lawn Gardens, Inc., except the last one hereinabove set forth, that is, that both corporations were formed or availed of with the proscribed view. Therefore the contested issue in this case is whether the two corporations were formed or availed of with a view of collapsing them as defined in § 117(m).

According to common understanding, the phrase "with a view to" means "with the purpose of; intending or with a hope of; anticipation of; looking forward to." Webster's New 20th Century Dictionary (2d ed) 1958. However, Treasury Regulation 111 (1939 Code) § 29.-117–11(b) provides that the requisite view exists if such action "was contemplated unconditionally, conditionally, or as a recognized possibility."

Under the same Regulation it is provided that the requisite view must occur prior to completion of construction. The restrictiveness of this provision has been questioned in the case of Glickman v. Commissioner, 256 F.2d 108 (C.A. 2, 1958).

The "view", purpose, or intent must be determined as a question of fact from all of the evidence adduced. Maxwell Temkin, 35 T.C. 906, 910 (1961). On this question, the history and background of the corporation is pertinent. 3B Mertens Law of Federal Income Taxation, p. 250.

Plaintiffs have advanced the argument that the requisite view does not exist unless there is an excess of mortgage proceeds channeled back into the hands of the stockholders. It is true that in many of the cases cited by plaintiffs that circumstance did exist. However, there is no such limitations in the statute or regulations, and the Court is of the opinion that it is merely an evidentiary fact going to intent, and is not conclusive. In Bryan v. Commissioner, 32 T.C. 104, 127, aff'd 281 F.2d 238 (C. A. 4, 1961), the Tax Court said:

"It is apparently their contention that if the redemptions were made out of rental income the gain derived by the stockholders is not attributable to the properties constructed. With this we disagree. Since the properties constructed were for rental purposes, obviously the income to be derived from the properties would consist of rentals. * * But we consider it immaterial whether the distribution in redemp-

tion of the stock were paid out of the mortgage loans or whether they were paid out of rentals received by the corporation. In either event the gain derived by the shareholders was attributable entirely to the property constructed."

Plaintiffs have cited Example 1 of Reg. 29.117–11 in support of their contention that distribution of excess mortgage proceeds are essential in order that § 117(m) apply. Although the facts of the example involve excess mortgage proceeds, the explanation of the applicability of § 117(m) set forth in the example is based on a distribution and realization of a gain attributable to the building constructed by the corporation, and makes no mention of excess mortgage proceeds as an essential element.

Example 2 of the Regulation, which illustrates a collapsible corporation in the building construction business, makes no mention of excess mortgage proceeds either in the facts or explanation.

Plaintiffs have also advanced the argument that § 117(m) does not apply when taxpayers would have been entitled to capital gain treatment had they not used the corporate device. However, this question was disposed of and decided against the taxpayer in a recent decision of the Supreme Court, Braunstein v. Commissioner, 374 U.S. 65, 83 S.Ct. 1663, 10 L.Ed.2d 757 (1963).

The question of a "view" (intent) is a subjective mental state and one that is difficult to determine. This is particularly true where the issue to be determined is the time when the subjective mental state was originally developed.

■ It is the Court's opinion that the resolution of this issue must be found in the entire history of the corporations both prior and subsequent to the completion of construction. The Court must look to all the facts and circumstances in order to determine when the proscribed view occurred.

[5] If the tangible aspects of a collapsible corporation are shown to have occurred and there is an absence of com-pelling circumstances arising after completion of construction which caused the sale of the corporation's stock or caused a distribution of cash to shareholders, then a prima facie case of "collapsibility" has been made out, and § 117(m) is applicable.

In Regulation 29.117–11(d) (1939 Code) there is set forth the following: "If the sale, exchange or distribution is attributable to circumstances present at the time of the manufacture, construction, production, or purchase, the corporation shall, in the absence of compelling facts to the contrary, be considered to have been so formed or availed of."

In the case of Burge v. Commissioner, 253 F.2d 765 (C.A. 4, 1958), the Court held:

"It is not necessary that the 'view' exist at the time the corporation is formed. It is sufficient that it exist when the corporation is 'availed of'".

■ A basic argument asserted by plaintiffs in this action is that the requisite view did not exist as to either of the corporations, in that, the sale and distribution occurred after the completion of construction on each of the projects.

In answer to a similar argument, the Fourth Circuit Court of Appeals in the case of Spangler v. Commissioner, 278 F.2d 665, 671 (1960) stated:

"Neither the decisional law nor the Treasury Regulations support the taxpayer's argument."

See also, Glickman v. Commissioner, 256 F.2d 108, 111 (C.A. 2, 1958) and Sidney v. Commissioner, 273 F.2d 928 (C.A. 2, 1960; Braunstein v. Commissioner, 305 F.2d 949 (C.A. 2, 1962) aff'd 374 U.S. 65, 83 S.Ct. 1663, 10 L.Ed.2d 757 (1963).

Examples of intervening or compelling circumstances held sufficient to remove a case from within the ambit of § 117(m) are: Discovery of a structural defect, Jacobson v. Commissioner, 281 F.2d 703 (C.A. 3, 1960); heart attack of principal, Maxwell Temkin, 35 T.C. 906

(1961); and forced sale to military authority, Rev.Rul. 57–575.

█ In view of the foregoing authorities, the Court has concluded that both corporations were "collapsible" and within the meaning and intent of § 117(m).

As to Euclid Gardens, Inc., there is evidence in the record that an intent to sell the stock of the corporation existed prior to the completion of construction.

The actual contract of sale was entered into on May 5, 1950 and was the culmination of the discussion had between Hyman Epstein and Harry Ratner in early March, 1950.

Plaintiffs contend that the project was completed by April 13, 1950, and that the view to sell arose thereafter. This contention is not supported by the record.

Prior to April 13, 1950, Hyman Epstein, the senior partner of Epstein Construction and President of Euclid Gardens, Inc., discussed the contemplated sale to the Ratner interests with Paul Ellis, Secretary of Euclid Gardens, Inc. The conversation took place on the site of the apartment project where Mr. Ellis was employed as superintendent of construction.

There was also evidence that as of May 5, 1950 some work remained to be done on the suites, such as the final coat of paint and installation of hardware, and that the offsite improvements had not been completed. The contract itself stipulated a proration date of October 31, 1950 and the closing date was contingent upon the project being completed. The request for the final advance of funds on the construction loan was not made until November 15, 1950.

Under the facts as to this corporation, even an assumption that construction was completed on April 13, 1950 would not change the ultimate conclusion.

The record is entirely lacking of any evidence as to a compelling change in circumstances between April 13, 1950 and May 5, 1950 which would generate a sale of Euclid Gardens, Inc. That being so, the Court concludes that the proscribed "view" of § 117(m) existed prior to April 13, 1950.

Plaintiffs have emphasized the fact that Epstein Construction Company, the partnership, reported a contractor's profit of over $291,000 on the Euclid Gardens project, and paid taxes thereon as ordinary income. It is urged by plaintiffs that this fact is wholly inconsistent with an intent to use the corporation to secure capital gains treatment for the profit derived from the sale of the project. The Court has considered this, but finds this circumstance insufficient to overcome the other evidence leading to the conclusion that Euclid Gardens, Inc., was a collapsible corporation.

There is an additional factor which the Court has considered with regard to Euclid Gardens, Inc., the amendment of the Articles of Incorporation.

Plaintiffs explain that action as being necessitated by the need to comply with the requirements of Federal Housing Administration. That would explain the amendment to provide for the issuance of preferred stock and authority to issue evidence of indebtedness. It does not explain the amendment "to create a private corporation to provide housing for rent *or sale*," nor the issuance of two classes of common stock, which capital structure more easily lends itself to the collapsing of the corporation.

As to Park-Lawn Gardens, Inc., the same method of capitalization with two classes of common stock was utilized. This method of capitalization lends itself readily to the redemption of stock and a return of capital invested without losing control of the corporation.

All the tangible aspects of a collapsible corporation are shown to have occurred in this corporation, and there appears to be no explained purpose for the redemption of the Park-Lawn stock and distribution of cash, following so closely upon the completion of construction, except for the obvious purpose of furnishing the stockholders with the surplus funds held by the corporation.

Plaintiffs had an initial investment in Park-Lawn of $100,625. This capital figure represents 100 shares of Class A common stock at $1,000 per share and 25 shares of Class B common stock at $25.00 per share.

On June 30, 1951 redemption was authorized of 160 shares of Class A common, and the remaining 50 shares of Class A stock was authorized to be redeemed on September 24, 1951.

On September 10, 1951 a distribution to Class B shareholders at the rate of $1,700 per share was approved, and a journal entry of October 31, 1951 reflects payment of $42,500 to Hyman Epstein for said distribution.

Thus, within six months from receipt of the last authorization of occupancy from F.H.A. (not including the suite used as an office) plaintiffs had recaptured all of their original investment in Class A stock amounting to $100,000, had realized a gain of $42,500, and still retained a 50% interest in the ownership of the apartment project on an investment of $625.00.

The surplus distributed to the shareholders represented rents received and was created by the device of writing up the value of the corporate assets and assigning the excess to capital accounts.

All the tangible aspects of a collapsible corporation as to Park-Lawn Gardens, Inc., have been shown to have occurred. There were no circumstances shown by the evidence which occurred after the completion of the apartment project which were not present at the time the corporation was formed and during the period of construction.

It is the opinion of the Court, in the absence of facts showing a change in circumstances which compelled the distribution to shareholders and in the absence of evidence explaining a compelling reason for said distribution within so short a time after completion of construction, that the corporation was availed of with the "requisite view" so as to become a collapsible corporation and therefore §

117(m) must be deemed applicable to the said distribution.

Judgment is hereby rendered for defendant in each of the eight captioned actions. This Memorandum is adopted as Findings of Fact and Conclusions of Law, in accordance with Rule 52 Federal Rules of Civil Procedure.