## BRAUNSTEIN et al. v. COMMISSIONER OF INTERNAL REVENUE.

No. 476.  Argued April 29, 1963.—
Decided June 10, 1963.

*Louis Eisenstein* argued the cause for petitioners. With him on the briefs were *Thurman Arnold* and *Julius M. Greisman.*

*Wayne G. Barnett* argued the cause for respondent. With him on the brief were *Solicitor General Cox, Acting Assistant Attorney General Jones, Harry Baum* and *Gilbert E. Andrews.*

MR. JUSTICE HARLAN delivered the opinion of the Court.

This case involves the applicability of the "collapsible corporation" provisions of the federal income tax laws which, during the period relevant here, were set forth in

§ 117 (m) of the Internal Revenue Code of 1939.[1] These provisions require that under certain circumstances, gain from the sale of stock which would otherwise be considered as long-term capital gain, and accordingly taxed at

---

[1] Section 117 (m) was added to the Internal Revenue Code of 1939 by the Revenue Act of 1950, § 212 (a), 64 Stat. 934. The section was amended by the Revenue Act of 1951, § 326, 65 Stat. 502. It was reenacted without substantial change as § 341 of the Internal Revenue Code of 1954, 68A Stat. 107, and was amended by the Technical Amendments Act of 1958, § 20 (a), 72 Stat. 1615, and by the Act of October 16, 1962, § 13 (f) (4), 76 Stat. 1035. As originally enacted, and during the period relevant here, it provided:

"(1) TREATMENT OF GAIN TO SHAREHOLDERS.—Gain from the sale or exchange (whether in liquidation or otherwise) of stock of a collapsible corporation, to the extent that it would be considered (but for the provisions of this subsection) as gain from the sale or exchange of a capital asset held for more than 6 months, shall; except as provided in paragraph (3), be considered as gain from the sale or exchange of property which is not a capital asset.

"(2) DEFINITIONS.—

"(A) For the purposes of this subsection, the term 'collapsible corporation' means a corporation formed or availed of principally for the manufacture, construction, or production of property, or for the holding of stock in a corporation so formed or availed of, with a view to—

"(i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation manufacturing, constructing, or producing the property of a substantial part of the net income to be derived from such property, and

"(ii) the realization by such shareholders of gain attributable to such property.

 .  .  .  .  .

"(3) LIMITATIONS ON APPLICATION OF SUBSECTION.—In the case of gain realized by a shareholder upon his stock in a collapsible corporation—

"(A) this subsection shall not apply unless, at any time after the commencement of the manufacture, construction, or production of the property, such shareholder (i) owned (or was considered as owning) more than 10 per centum in value of the outstanding stock of

a maximum rate of 25%, must be reported as ordinary income.

The three taxpayers who are petitioners here became associated in 1938 and have since participated in a number of construction projects, usually through corporations in which the stock was equally divided.[2] In 1948 the petitioners received a commitment from the Federal Housing Administration to insure loans for the construction of a multiple-dwelling apartment project in Queens County, New York. Two corporations were formed to carry out this project, and each petitioner was issued one-third of the stock in each corporation. After the costs of construction had been paid, the corporations each had an unused amount of mortgage loan funds remaining, and in 1950 the petitioners sold their stock at a profit, receiving as part of the sale transaction distributions from the corporations which included the unused funds. The petitioners reported the excess of the amounts received over their bases in the stock as long-term capital gains of $313,854.17 each.[3]

---

the corporation, or (ii) owned stock which was considered as owned at such time by another shareholder who then owned (or was considered as owning) more than 10 per centum in value of the outstanding stock of the corporation;

"(B) this subsection shall not apply to the gain recognized during a taxable year unless more than 70 per centum of such gain is attributable to the property so manufactured, constructed, or produced; and

"(C) this subsection shall not apply to gain realized after the expiration of three years following the completion of such manufacture, construction, or production. . . ."

[2] Petitioners Benjamin and Harry Neisloss are builders; petitioner Braunstein, an architect. Their wives are parties only by virtue of the filing of joint returns.

[3] The parties have agreed that the distributions from the corporations and the amounts received directly from the buyers of the stock may be considered together, as if the entire amount had been received from the buyers.

The Commissioner asserted a deficiency, treating the gain as ordinary income on the ground that the corporations were "collapsible" within the meaning of § 117 (m). The Tax Court sustained the Commissioner, 36 T. C. 22, and the Court of Appeals affirmed the Tax Court, 305 F. 2d 949, holding that (1) the taxpayers had the requisite "view" during construction of the property (see note 1, *supra*); (2) more than 70% of the gain realized by the taxpayers was attributable to the constructed property (*id.*); and (3) § 117 (m) applies even if the constructed buildings would have produced capital gain on a sale by the taxpayers had no corporations been formed. This last holding was in response to an argument by the taxpayers based on a theory similar to that adopted by the Court of Appeals for the Fifth Circuit in *United States* v. *Ivey,* 294 F. 2d 799. In view of the conflict between the decision below and that in *Ivey* on this point, we granted certiorari, 371 U. S. 933, stating that the grant was limited to the following question:

> "Whether Section 117 (m) of the Internal Revenue Code of 1939, which provides that gain 'from the sale or exchange . . . of stock of a collapsible corporation' is taxable as ordinary income rather than capital gain, is inapplicable in circumstances where the stockholders would have been entitled to capital gains treatment had they conducted the enterprise in their individual capacities without utilizing a corporation."

Briefly summarized, petitioners' argument runs as follows: As the legislative history shows, the collapsible corporation provisions of the code were designed to close a loophole through which some persons had been able to convert ordinary income into long-term capital gain by use of the corporate form. For example, in the case of an individual who constructed a property which he held

primarily for sale to customers in the ordinary course of his trade or business, any gain from the sale of the asset would be ordinary income;[4] but if that same individual were to form a corporation to construct the property, intending to sell his stock on the completion of construction, it was at least arguable prior to the enactment of § 117 (m) that the proceeds of the ultimate sale of the stock were entitled to capital-gains treatment. It was this and similar devices that § 117 (m) was designed to frustrate, but it was *not* intended to have the inequitable effect of converting into ordinary income what would properly have been a capital gain prior to its enactment even in the absence of any corporate form. Thus, it is argued, the phrase "gain attributable to such property," as used in § 117 (m), must apply only to profit that would have constituted ordinary income if a corporation had not been utilized, for only in such cases is the corporation made to serve as a device for tax avoidance. In the present case, neither the corporation nor the individual petitioners were in the trade or business of selling apartment buildings, and thus the corporations were not used to convert ordinary income into capital gain and the provisions of § 117 (m) are inapplicable.[5]

We have concluded that petitioners' contentions must be rejected. Their argument is wholly inconsistent with the plain meaning of the language of § 117 (m), and we find nothing in the purpose of the statute, as indicated by its legislative history, to warrant any departure from that meaning in this case.

---

[4] Int. Rev. Code, 1939, § 117 (a) (1) (A).

[5] The Government has assumed for purposes of its argument here, but does not concede, that petitioners would have been entitled to capital-gains treatment had they conducted the enterprise without utilizing a corporation.

## I.

As to the language used, § 117 (m) defines a collapsible corporation as embracing one formed or availed of principally for the manufacture, construction, or production of property with a view to (1) the sale or exchange of stock prior to the realization by the corporation of a substantial part of the net income from the property *and* (2) the realization "of gain attributable to such property." The section is then expressly made inapplicable to gain realized during any year "unless more than 70 per centum of such gain is attributable to the property so manufactured, constructed, or produced." If used in their ordinary meaning, the word "gain" in these contexts simply refers to the excess of proceeds over cost or basis, and the phrase "attributable to" merely confines consideration to that gain caused or generated by the property in question. With these definitions, the section makes eminent sense, since the terms operate to limit its application to cases in which the corporation was availed of with a view to profiting from the constructed property by a sale or exchange of stock soon after completion of construction *and* in which a substantial part of the profit from the sale or exchange of stock in a given year was in fact generated by such property.

There is nothing in the language or structure of the section to demand or even justify reading into these provisions the *additional* requirement that the taxpayer must in fact have been using the corporate form as a device to convert ordinary income into capital gain. If a corporation owns but one asset, and the shareholders sell their stock at a profit resulting from an increase in the value of the asset, they have "gain attributable to" that asset in the natural meaning of the phrase regardless of their desire, or lack of desire, to avoid the bite of federal income taxes.

## II.

Nor is there anything in the legislative history that would lead us to depart from the plain meaning of the statute as petitioners would have us do. There can of course be no question that the purpose of § 117 (m) was, as petitioners contend, to close a loophole that Congress feared could be used to convert ordinary income into capital gain. See H. R. Rep. No. 2319, 81st Cong., 2d Sess.; S. Rep. No. 2375, 81st Cong., 2d Sess. But the crucial point for present purposes is that the *method* chosen to close this loophole was to establish a carefully and elaborately. defined category of transactions in which what might otherwise be a capital gain would have to be treated as ordinary income. There is no indication whatever of any congressional desire to have the Commissioner or the courts make a determination in each case as to whether the use of the corporation was for tax avoidance. Indeed, the drawing of certain arbitrary lines not here involved—such as making the section inapplicable to any shareholder owning 10% or less of the stock or to any gain realized more than three years after the completion of construction—tends to refute any such indication. It is our understanding, in other words, that Congress intended to define what it believed to be a tax avoidance device rather than to leave the presence or absence of tax avoidance elements for decision on a case-to-case basis.

We are reinforced in this conclusion by the practical difficulties—indeed the impossibilities—of considering without more legislative guidance than is furnished by § 117 (m) whether there has in fact been "conversion" of ordinary income into capital gains in a particular case. For example, if we were to inquire whether or not the profit would have been ordinary income had an enterprise been individually owned, would we treat each taxpaying shareholder differently and look only to *his* trade

or business or would we consider the matter in terms of the trade or business of *any* or at least a substantial number of the shareholders? There is simply no basis in the statute for a judicial resolution of this question, and indeed when Congress addressed itself to the problem in 1958, it approved an intricate formulation falling between these two extremes.[6]

As a further example, what if the individual in question is not himself engaged in any trade or business but owns stock in varying amounts in a number of corporate ventures other than the one before the court? Do we pierce *each* of the corporate veils, regardless of the extent and share of the individual's investment, and charge him with being in the trade or business of each such corporation? Again, there is no basis for a rational judicial answer; the judgment is essentially a legislative one and in the 1958 amendments Congress enacted a specific provision, designed to deal with this matter, that is far too complex to be summarized here.[7]

These examples should suffice to demonstrate the point: The question whether there has in fact been a "conversion" of ordinary income in a particular case is far easier to state than to answer, and involves a number of thorny issues that may not appear on the surface.[8] We find no

---

[6] Int. Rev. Code, 1954, § 341 (e), added by the Technical Amendments Act of 1958, § 20 (a), 72 Stat. 1615.

[7] Int. Rev. Code, 1954, § 341 (e) (1) (C).

[8] The Government has emphasized in its argument here that the present case involves a particularly "blatant" conversion of ordinary income because by charging the corporations only for the out-of-pocket costs of construction "petitioners contributed their services to create a valuable property for the corporation[s] and then realized upon that value by selling their stock." Thus, the Government concludes, the petitioners claim as capital gain "what ought to have been (and, in an arm's-length transaction, would have been) taxed as compensation for services."

basis in either the terms or the history of § 117 (m) for concluding that Congress intended the Commissioner and the courts to enter this thicket and to arrive at *ad hoc* determinations for every taxpayer. Accordingly, the judgments below must be

*Affirmed.*

MR. JUSTICE DOUGLAS dissents.