Edward L. WINN and Gertrude S. Winn, Plaintiffs,

v.

The UNITED STATES of America, Defendant.

Gus RAU, Jr., and Lael J. Rau, Plaintiffs,

v.

The UNITED STATES of America, Defendant.

Paul L. TAYLOR and Madeline E. Taylor, Plaintiffs,

v.

The UNITED STATES of America, Defendant.

Civ. A. Nos. 13227-4—13229-4.

United States District Court
W. D. Missouri, W. D.

June 18, 1965.

Alfred Kuraner, of Kuraner, Oberlander, Lamkin, Dingman & O'Laughlin, Kansas City, Mo., R. Eugene McGannon, of Hoskins, King, Springer & McGannon, Kansas City, Mo., for plaintiffs.

F. Russell Millin, U. S. Atty., and Calvin K. Hamilton, Asst. U. S. Atty., Kansas City, Mo., Louis F. Oberdorfer, Asst. Atty. Gen., Edward S. Smith, Jerome Fink, Robert W. Ryan, Jr., Attys., Dept. of Justice, Washington, D. C., for defendant.

BECKER, District Judge.

Each of these consolidated civil actions is a suit for the refund of federal income taxes and interest thereon. Because the actions involve common questions of law and fact, they have been consolidated for trial and determination.

Plaintiffs have complied with all conditions precedent to the institution of these actions. Jurisdiction to determine the actions exists under Section 1346 of Title 28, U.S.C.

In each of the consolidated actions the plaintiffs are husband and wife who timely filed joint federal income tax returns for the taxable year ended December 31, 1954. In each case after audit of the 1954 joint federal income tax return, the Commissioner of Internal Revenue determined that the plaintiff taxpayers had erroneously reported proceeds from the sale of the capital stock of Interstate Rental Corporation ("Interstate" hereinafter) as long term capital gain. The Commissioner further determined that the proceeds of the sale of said capital stock were the proceeds of sale of stock of a "collapsible corporation" of which the taxpayers in each case owned more than five percent; that therefore the proceeds were taxable as ordinary income under the provisions of Section 341 of the 1954 Internal Revenue Code (formerly Section 117(m), Internal Revenue Code of 1939). Pursuant to this determination the Commissioner issued separate statutory notices of deficiency to the plaintiffs Winn, the plaintiffs Rau, and the plaintiffs Taylor.

Thereafter, the plaintiffs paid the income tax deficiencies proposed in the notices of deficiency and the assessed interest thereon in the following amounts on the following dates:

| | Income Tax Deficiency | | Assessed Interest | | |
|---|---|---|---|---|---|
| | Amount | Date | Amount | Date | |
| Plaintiffs Winn | $9,371.16 | 7–31–58 | $ 96.71 | 10–15–58 | (Credit 1954) |
| | | | 1,852.02 | 10–17–58 | |
| Plaintiffs Rau | 8,818.77 | 7–31–58 | 91.01 | 10–15–58 | (Credit 1954) |
| | | | 1,742.85 | 10–23–58 | |
| Plaintiffs Taylor | 1,994.27 | 8–6–58 | 396.08 | 10–14–58 | |
| | | | 18.63 | 10–15–58 | (Credit 1954) |

After timely filing of claims for refund and denial thereof, the plaintiffs instituted these actions.

At all times herein mentioned, Winn-Rau Corporation ("Winn-Rau" hereinafter) was a business corporation with

a total outstanding issue of 1,030 shares of common capital stock owned as follows:

| Plaintiffs Winn | 264 shares |
| Plaintiffs Rau | 264 shares |
| Larry Winn, Jr. | 251 shares |
| Kurt E. Rau | 126 shares |
| Herb Rau | 125 shares |

At all times mentioned herein, the plaintiffs Winn, together with their son and daughter, owned 14.62 percent of the capital stock of another business corporation named Meadowlake Corporation ("Meadowlake" hereinafter).

Prior to 1950, Meadowlake acquired unimproved lands in Johnson County, Kansas, near Kansas City, Missouri, for development as a residential area. These lands were subdivided by Meadowlake in a subdivision known as "Meadowlake Subdivision". In the years 1950 and 1951, Meadowlake sold portions of Meadowlake Subdivision to Winn-Rau. Winn-Rau developed these adjoining portions of Meadowlake Subdivision as jobs numbered 1, 2, and 3 (see plat, Parties Ex. 15).

On the portion of the Meadowlake Subdivision designed Job No. 1, Winn-Rau built 105 houses, all of which were sold to the public. On Job No. 2 of Meadowlake Subdivision, Winn-Rau built 105 houses, all of which were sold to the public (Lot No. 1, Block 17, of Job No. 2 was later acquired from Deemer, an individual, by Interstate). On Job No. 3, Winn-Rau built 176 houses, 95 of which were sold to the public and 81 of which were sold to Interstate under the option agreement hereinafter mentioned.

In the years 1952 and 1953, Winn-Rau acquired for development as a residential area approximately 340 acres of land in Wyandotte County, Kansas, near Kansas City, Missouri, which Winn-Rau caused to be platted as Highland Crest Addition. During 1954, Winn-Rau built in this addition 253 houses, which were sold to the public, and an additional 153 houses which were built under contract for Interstate as hereinafter described.

Winn-Rau recorded its direct costs of labor and material under Job Nos. 1, 2, and 3, of Meadowlake Subdivision under the separate job numbers without allocation to the individual houses in each job.

Interstate was incorporated under the laws of the State of Kansas on April 2, 1952.

Plaintiffs Winn purchased 39 shares of the common capital stock of Interstate in April 1952 at a cost of $975. These 39 shares were sold by agreement dated November 22, 1954, for a total sales price of $82,977.55. Of the total purchase price, plaintiffs Winn received $21,872.88 in the calendar year 1954, a sum less than 30 percent of the total sales price. These 39 shares were held by the owners more than six months prior to the sale thereof and were never held for sale to customers in the ordinary course of the owners' trade or business.

Plaintiffs Rau purchased 39 shares of the common capital stock of Interstate in April 1952 at a cost of $975. These 39 shares were sold by agreement dated November 22, 1954, for a total sales price of $82,977.55. Of the total purchase price, plaintiffs Rau received $21,872.88 in the calendar year 1954, a sum less than 30 per cent of the total sales price. These 39 shares were held by the owners more than six months prior to the sale thereof, and were never held for sale to customers in the ordinary course of the owners' trade or business.

Plaintiffs Taylor purchased 20 shares of the common capital stock of Interstate in April 1952 at a cost of $500. These 20 shares were sold by agreement dated November 22, 1954, for a total sales price of $42,552.59. Of the total purchase price, plaintiffs Taylor received $11,216.86 in the calendar year 1954, a sum less than 30 percent of the total sales price. These 20 shares were held by the owners more than six months prior to the sale thereof and were never held for sale to customers in the ordinary course of the owners' trade or business.

The agreement of sale of the shares of the capital stock of Interstate dated November 22, 1954, was executed by the plaintiffs and others as sellers and Dr. Marcel L. Mooney (or his nominee) as purchaser (Parties Ex. 10). This was an arm's length transaction with an unrelated party as purchaser. The total purchase price payable to the plaintiffs and others as sellers of all the authorized and outstanding capital stock of Interstate, was determined by negotiation on the basis of the net worth of Interstate with the equity in the houses in Meadowlake Subdivision valued at $2,100 per unit and the equity in the houses in Highland Crest valued at $1,000 per unit.

Following its incorporation in April 1952, Interstate acquired from Winn-Rau an option to purchase from time to time over a period of two years any one or more of the homes owned by Winn-Rau in Meadowlake Subdivision for specified prices. In 1952 and 1953 Interstate purchased 81 houses in Meadowlake Subdivision from Winn-Rau under the option agreement mentioned above, and also purchased from Deemer the house in Meadowlake Subdivision mentioned earlier. In 1953, Interstate purchased an additional nine houses in Meadowlake Subdivision from Meadowlake. Upon acquisition by Interstate, each of the 91 houses in Meadowlake Subdivision was leased to an individual tenant. Houses with one-car garages were leased for $125 a month. Houses with two-car garages were leased for $150 a month.

Prior to October 31, 1954, Interstate had sold 61 of the 91 houses which it had owned in Meadowlake Subdivision.

In 1954, Interstate constructed, under agreement with the Federal Housing Administration ("FHA" hereinafter), 153 rental houses in Highland Crest Subdivision, approximately 15 miles from Meadowlake Subdivision. Under the agreement with FHA, Interstate obligated itself to rent these houses and agreed not to sell them for a period of at least two years. Interstate purchased the land in Highland Crest Subdivision from Winn-Rau and contracted for the construction of the rental houses by Winn-Rau. During May 1954, the 153 houses were completed by Winn-Rau. These 153 houses were rented by Interstate as its Highland Crest rental project. All were in one integrated project involving property similar in kind.

## QUESTIONS PRESENTED

The principal question presented is whether the plaintiffs have sustained the burden of showing that the Commissioner was in error in determining that the sale of plaintiffs' stock in Interstate in November 1954 was the sale of stock of a collapsible corporation as defined in Section 341(b) (1) of the Internal Revenue Code of 1954 (formerly Section 117(m) (2) (A), Internal Revenue Code of 1939). If the plaintiffs have sustained this burden, they are entitled to recover in this action. If they have not, their claim for refund should be denied, under Section 341(a) of the Internal Revenue Code of 1954. The subsidiary questions will be discussed hereinafter.

## STATUTE INVOLVED

The material portions of the statute applying to this case, Section 341(a), 341(b), 341(d), and 341(d) (2), are as follows:

"§ 341. Collapsible corporations

"(a) Treatment of gain to shareholders.—Gain from—

"(1) the sale or exchange of stock of a collapsible corporation,

"(2) a distribution in partial or complete liquidation of a collapsible corporation, which distribution is treated under this part as in part or full payment in exchange for stock, and

"(3) a distribution made by a collapsible corporation which, under section 301(c) (3) (A), is treated, to the extent it exceeds the basis of the stock, in the same manner as a gain from the sale or exchange of property,

to the extent that it would be considered (but for the provisions of

this section) as gain from the sale or exchange of a capital asset held for more than 6 months shall, except as provided in subsection (d), be considered as gain from the sale or exchange of property which is not a capital asset.

"(b) Definitions.—

"(1) Collapsible corporation.— For purposes of this section, the term 'collapsible corporation' means a corporation formed or availed of principally for the manufacture, construction, or production of property, for the purchase of property which (in the hands of the corporation) is property described in paragraph (3), or for the holding of stock in a corporation so formed or availed of, with a view to—

"(A) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, before the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the taxable income to be derived from such property, and

"(B) the realization by such shareholders of gain attributable to such property.

"(2) Production of purchase of property.—For purposes of paragraph (1), a corporation shall be deemed to have manufactured, constructed, produced, or purchased property, if—

"(A) it engaged in the manufacture, construction, or production of such property to any extent,

"(B) it holds property having a basis determined, in whole or in part, by reference to the cost of such property in the hands of a person who manufactured, constructed, produced, or purchased the property, or

"(C) it holds property having a basis determined, in whole or in part, by reference to the cost of property, manufactured, constructed, produced, or purchased by the corporation.

"(3) Section 341 assets.—For purposes of this section, the term 'section 341 assets' means property held for a period of less than 3 years which is—

"(A) stock in trade of the corporation, or other property of a kind which would properly be included in the inventory of the corporation if on hand at the close of the taxable year;

"(B) property held by the corporation primarily for sale to customers in the ordinary course of its trade or business;

"(C) unrealized receivables or fees, except receivables from sales of property other than property described in this paragraph; or

"(D) property described in section 1231(b) (without regard to any holding period therein provided), except such property which is or has been used in connection with the manufacture, construction, production, or sale of property described in subparagraph (A) or (B).

In determining whether the 3-year holding period specified in this paragraph has been satisfied, section 1223 shall apply, but no such period shall be deemed to begin before the completion of the manufacture, construction, production, or purchase.

"(4) Unrealized receivables.— For purposes of paragraph (3) (C), the term 'unrealized receivables or fees' means, to the extent not previously includible in income under the method of accounting used by the corporation, any rights (contractual or otherwise) to payment for—

"(A) goods delivered, or to be delivered, to the extent the proceeds therefrom would be treated as amounts received from the sale or exchange of property other than a capital asset, or

"(B) services rendered or to be rendered.

\* \* \* \* \* \*

"(d) Limitations on application of section.—In the case of gain realized by a shareholder with respect to his stock in a collapsible corporation, this section shall not apply—

\* \* \* \* \* \*

"(2) to the gain recognized during a taxable year, unless more than 70 percent of such gain is attributable to the property so manufactured, constructed, produced, or purchased; and \* \*."

## REGULATIONS INVOLVED

The material portions of the Treasury Regulations on Income Tax (1954 Code) involved in this case are Sections 1.341–2 (a) (2), 1.341–2(a) (3), 1.341–2(a) (4), 1.341–5(b), 1.341–5(c), and 1.341–5(c), (2), which are as follows:

" § 1.341–2. Definitions

"(a) Determination of collapsible corporation.

\* \* \* \* \* \*

"(2) Under section 341(b) (1) the corporation must be formed or availed of with a view to the action therein described, that is, the sale or exchange of its stock by its shareholders, or a distribution to them prior to the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the taxable income to be derived from such property, and the realization by the shareholders of gain attributable to such property. This requirement is satisfied in any case in which such action was contemplated by those persons in a position to determine the policies of the corporation, whether by reason of their owning a majority of the voting stock of the corporation or otherwise. The requirement is satisfied whether such action was contemplated, unconditionally, conditionally, or as a recognized possibility. If the corporation was so formed or availed of, it is immaterial that a particular shareholder was not a shareholder at the time of the manufacture, construction, production, or purchase of the property, or if a shareholder at such time, did not share in such view. Any gain of such a shareholder on his stock in the corporation shall be treated in the same manner as gain of a shareholder who did share in such view. The existence of a bona fide business reason for doing business in the corporate form does not, by itself, negate the fact that the corporation may also have been formed or availed of with a view to the action described in section 341(b).

"(3) A corporation is formed or availed of with a view to the action described in section 341(b) if the requisite view existed at any time during the manufacture, production, construction, or purchase referred to in that section. Thus, if the sale, exchange, or distribution is attributable solely to circumstances which arose after the manufacture, construction, production, or purchase (other than circumstances which reasonably could be anticipated at the time of such manufacture, construction, production, or purchase), the corporation shall, in the absence of compelling facts to the contrary, be considered not to have been so formed or availed of. However, if the sale, exchange or distribution is attributable to circumstances present at the time of the manufacture, construction, production, or purchase,

the corporation shall, in the absence of compelling facts to the contrary, be considered to have been so formed or availed of.

"(4) The property referred to in section 341(b) is that property or the aggregate of those properties with respect to which the requisite view existed. In order to ascertain the property or properties as to which the requisite view existed, reference shall be made to each property as to which, at the time of the sale, exchange, or distribution referred to in section 341(b) there has not been a realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the taxable income to be derived from such property. However, where any such property is a unit of an integrated project involving several properties similar in kind, the determination whether the requisite view existed shall be made only if a substantial part of the taxable income to be derived from the project has not been realized at the time of the sale, exchange, or distribution, and in such case the determination shall be made by reference to the aggregate of the properties constituting the single project.

\* \* \* \* \* \*

" § 1.341–5.  Application of section

\* \* \* \* \* \*

"(b) The following facts will ordinarily be considered sufficient (except as otherwise provided in paragraph (a) of this section and paragraph (c) of this section) to establish that a corporation is a collapsible corporation:

"(1) A shareholder of the corporation sells or exchanges his stock, or receives a liquidating distribution, or a distribution described in section 301(c) (3) (A),

"(2) Upon such sale, exchange, or distribution, such shareholder realizes gain attributable to the property described in subparagraphs (4) and (5) of this paragraph, and

"(3) At the time of the manufacture, construction, production, or purchase of the property described in subparagraphs (4) and (5) of this paragraph, such activity was substantially in relation to the other activities of the corporation which manufactured, constructed, produced, or purchased such property.

The property referred to in subparagraphs (2) and (3) of this paragraph is that property or the aggregate of those properties which meet the following two requirements:

"(4) The property is manufactured, constructed, or produced by the corporation or by another corporation stock of which is held by the corporation, or is property purchased by the corporation or by such other corporation which (in the hands of the corporation holding such property) is property described in section 341(b) (3), and

"(5) At the time of the sale, exchange, or distribution described in subparagraph (1) of this paragraph, the corporation which manufactured, constructed, produced, or purchased such property has not realized a substantial part of the taxable income to be derived from such property.

In the case of property which is a unit of an integrated project involving several properties similar in kind, the rules of this subparagraph shall be applied to the aggregate of the properties constituting the single project rather than separately to such unit.  Under the rules of this subparagraph, a corporation shall be considered a collapsible corporation by reason of holding

stock in other corporations which manufactured, constructed, produced, or purchased the property only if the activity of the corporation in holding stock in such other corporations is substantial in relation to the other activities of the corporation.

"(c) The absence of any of the facts set forth in paragraph (b) of this section or the presence of the following facts will ordinarily be considered sufficient (except as otherwise provided in paragraph (a) of this section) to establish that a corporation is not a collapsible corporation:

\* \* \* \* \* \*

"(2) In the case of a corporation subject to paragraph (b) of this section with respect to the manufacture, construction, or production (either by the corporation or by another corporation the stock of which is held by the corporation) of property, the amount of the unrealized taxable income from such property is not substantial in relation to the amount of the taxable income realized (after the completion of a material part of such manufacture, construction, or production, and prior to the sale, exchange, or distribution referred to in paragraph (b) (1) of this section) from such property and from other property manufactured, constructed, or produced by the corporation."

## SPECIFIC DECISIVE QUESTIONS

Applying the statutes and regulations to the factual and legal claims of the parties in this case, the following specific decisive questions appear:

1. Did the sale occur prior to the *realization* by Interstate of a substantial part of the income to be derived?

2. Was Interstate formed or availed of principally for the manufacture, construction, production, or purchase of Section 341 assets *with a view* to (a) the sale or exchange of stock by its shareholders prior to the realization by Interstate of a substantial portion of its net income to be derived from such property, and (b) the realization by such shareholders of gain attributable to such property?

3. Was Meadowlake Subdivision an unintegrated project with respect to Interstate, in which event the 70 percent limitation of Section 341(d) (2) is inapplicable?

If the answer to any one of the three questions is negative, the taxpayers are entitled to prevail in these cases. In determining the appropriate answer to the general and to the specific decisive questions, the rule that the burden of proving facts sufficient to warrant relief rests upon the taxpayers, is recognized and applied. No fact favorable to the taxpayers will be assumed unless stipulated or proved by a preponderance of the evidence. Upon this basis the three questions are answered as follows:

*Question No. 1, the "Realization" Question*

The answer to question number one involves a finding of fact as well as a conclusion of law. First, a finding of fact must be made upon what percentage of the net income to be derived from the corporate property had been realized at the time of the sale.

Plaintiffs submit that at the time of sale Interstate had realized 45.797 percent of the income to be derived (Plaintiffs' Ex. 5).

Defendant contends that at the time of the sale Interstate had realized only 30.8 percent of the income to be derived. The calculation in this contention of defendant results from treating the original contract price for the sale of Interstate stock "less certain adjustments" as the income to be derived.

As a matter of fact, the evidence establishes that Interstate had realized ap-

proximately 40 percent of the income to be derived at the time of sale.

Upon this finding of fact the question of law must be determined. On this question the defendant places its principal reliance upon the case of Abbott v. Commissioner (C.A. 3) 258 F.2d 537. If the doctrine of the Abbott case is sound, the defendant is correct in its claim that Interstate had not realized a substantial part of the income to be derived at the time of sale. This follows because the Abbott case (by a divided Court) held that the inquiry properly is whether a substantial part of the income to be derived remains unrealized. In this case the unrealized portion is obviously substantial.

But the weight of authority is now against the rule of the Abbott case. In two subsequent cases Courts of Appeals have rejected the doctrine of the Abbott case and have given the statute an interpretation more in keeping with its language rather than its assumed purpose. Commissioner v. Kelley (C.A. 5) 293 F.2d 904; Commissioner v. Zongker (C.A. 10) 334 F.2d 44.

In the Kelley case (also by a divided Court), Judge Wisdom exhaustively analyzed the statute in question, its origins, and reviewed the critical comment by writers on the statute and its objectives. The opinion of Judge Wisdom appears to be unassailable unless one ignores the plain language of the statute, now Section 341, Internal Revenue Code of 1954.

In the Kelley case the Court held that one-third of the income realized at the time of sale was a substantial part; that the test was whether a substantial part had been realized; that the doctrine of the Abbott case is unsound; that therefore the corporation in question was not a collapsible corporation. Further the Court conceded:

"The effect of our holding is to leave the loophole two-thirds open to these taxpayers. Section 117(m), as we feel we should construe it, seems therefore a poor sort of tool for plugging loopholes. But the best workman can work only with the tools he has. If Congress wants a better job done, Congress should provide a tool that will not just plug the loophole 'a substantial part of the way'." (Footnote omitted.) 293 F.2d 904, l. c. 913.

Later in the Zongker case, supra, the Court of Appeals for the Tenth Circuit followed the Kelley case in a unanimous opinion. The percentage of income realized at the time of sale in the Zongker case was 34 percent. In footnote 1 at page 46 of 334 F.2d, an addition was made to Judge Wisdom's list of current legal commentaries favorable to the view followed in the Kelley and Zongker cases.

■ Therefore, following the Kelley case, it is concluded that the sale in the case at bar did not occur prior to the realization by Interstate of a substantial part of the income to be derived. This conclusion has been reached after careful consideration of Braunstein v. Commissioner, 374 U.S. 65, 83 S.Ct. 1663, 10 L.Ed.2d 757. That case (while against the taxpayer on a different legal question) confirms Judge Wisdom's holding that the statute and regulations in question must be interpreted as they plainly read rather than to effect their general purpose to close a tax avoidance loophole. Other cases cited by the parties on this question are not directly in point or do not represent controlling authorities.

Although the finding and conclusion on this question determines this case in favor of plaintiffs, the remaining questions will be determined in order that this opinion may be complete.

*Question No. 2, the "View" Question*

■ From the evidence in this case it appears as a matter of fact that taxpayers did not form or at any time employ Interstate with view to the sale or exchange of stock prior to the realization of a substantial part of the net income to be derived from manufacture, construction, production, or purchase of Section 341 assets.

In reaching this finding, full effect has been given (without critical examination) to defendant's contentions concerning the applicable legal standards, including the following from the Brief of the Defendant, at pages 23 and 24:

"The Treasury Regulations under Section 341(b) of the Internal Revenue Code of 1954 state that the 'with a view to' or intent requirement is satisfied in any case in which the sale or exchange of stock or the distribution to shareholders was contemplated by those persons in a position to determine the policies of the corporation, whether by reason by their owning a majority of the voting stock of the corporation or otherwise. The requirement is satisfied whether such action was contemplated, unconditionally, conditionally, or as a recognized possibility. If the corporation was so formed or availed of, it is immaterial that a particular shareholder was not a shareholder at the time of the construction or purchase of the property, or, if a shareholder at such time, did not share in such view. Any gain of such a shareholder on his stock in the corporation shall be treated in the same manner as gain of a shareholder who did share in such view. Section 1.341–2(a) (2), Appendix, infra. A corporation is formed or availed of with a view to the action described in Section 341 (b) if the requisite view existed at any time during the construction or purchase referred to in that section. Thus, if the sale is attributable solely to circumstances which arose after the construction or purchase (*other than circumstances which reasonably could be anticipated at the time of such construction or purchase*), the corporation shall, in the absence of compelling facts to the contrary, be considered not to have been so formed or availed of. *However, if the sale is attributable to circumstances present at the time of the construction or purchase, the corpo-*

*ration shall, in the absence of compelling facts to the contrary, be considered to have been so formed or availed of.* Section 1.341–2(a) (3), Appendix, infra.

"At least two Courts of Appeals have gone so far as to indicate that no subjective intent is required to be shown, and that intent will be inferred where there is a collapsible transaction, i. e., sale or exchange of stock or liquidation in whole or in part, within the statutory three-year period and while a substantial part of taxable income remains to be realized."

The cases of Burge v. Commissioner (C. A.4) 253 F.2d 765, 74 A.L.R.2d 664 and Glickman v. Commissioner (C.A.2) 256 F.2d 108, relied on by the defendant, have been followed.

Briefly stated, the evidence in this case shows that Interstate was formed for the purpose of renting houses which Winn-Rau was unable to sell. These houses were in Job No. 3. The earliest commitments on these houses were in June 1951. In October 1950, the Board of Governors of the Federal Reserve System, with the concurrence of the Administrator of the Housing and Home Finance Agency, promulgated "Regulation X" restricting residential real estate construction credit, both private and government aided. Minimum down payments were sharply increased. The regulation was designed to help reduce the high inflationary pressures by restricting the flow of funds into the mortgage market, and thereby to reduce new home construction activity in 1951 to assure availability of labor and materials in the defense program of the Korean conflict (Plaintiffs' Ex. 7).

Winn-Rau's officers did not become aware of the effect of Regulation X on the salability of its Job No. 3 homes until the spring of 1952.

Regulation X did not apply to Winn-Rau homes under construction or on which commitments had been made, which continued to sell readily after Regulation X became effective.

When the drastic effect of Regulation X became apparent, Winn-Rau's officers decided to form Interstate to rent the unsalable houses, and to secure permanent loans by Interstate, thereby relieving Winn-Rau of the construction loans and improving credit of Winn-Rau. To have ceased building at this time would have involved considerable losses to Winn-Rau because of commitments to contractors for construction of 176 planned homes and because of anticipated deterioration of houses which would be left unfinished, numbering nearly one hundred.

At that time Interstate expected to remain in the rental business indefinitely. In early 1954 Interstate purchased land from Winn-Rau and constructed 153 rental houses in Highland Crest Addition. These houses were constructed for defense workers under a liberal financing agreement with FHA which provided that they could not be sold for two years.

Interstate encountered immediate difficulties with the defense rental houses because of the bad habits of the defense worker tenants, which it was required by agreement to accept. These tenants were partly transients, frequently failed to pay rent, vacated without notice frequently, and damaged the houses. Interstate then began to suffer financial reverses which prompted it to sell its stock. Fortunately for the taxpayers and unfortunately for the purchasers, the stock was sold for what proved to be a handsome price to purchasers whose agent initiated the sale negotiations. (Subsequent events deemed irrelevant to the issue here show that the new owners of Interstate had difficulties with Highland Crest and failed to earn a profit on their investment after allowances for depreciation.) The stock of Interstate was sold rather than the real estate and improvements because of the agreement not to sell them for two years.

On these facts it is concluded that the requisite view, described in Section 341 and the regulations thereunder, does not exist.

*Question No. 3, the 70 Percent Limitation—Integrated Project Question*

Assuming (contrary to the holdings, supra) that Section 341 is otherwise applicable, the remaining question is whether the 70 percent limitation of Section 341(d) (2), quoted above, renders Section 341 inapplicable with respect to Interstate. The answer to this question depends in turn upon whether or not with respect to Interstate the 30 houses in Meadowlake purchased from Winn-Rau constitute an integrated project. The parties are in substantial agreement that this is the critical issue.

If more than 70 percent of the gain from the sale of the property of Interstate is attributable to "collapsible assets" as referred to in Section 341(b), the limitation of Section 341(d) (2) is not applicable. The defendant submits its contentions in tabular form as follows:

"Percent of Taxpayers' Gain on Interstate Stock Attributable to Interstate Assets

*"Collapsible Assets*

| | | |
|---|---|---|
| "153 | Houses in Highland Crest | 51.86% |
| " 30 | Houses in Meadowlake | 29.03% |
| | | 80.89% |

*"Non-collapsible Assets*
"Other assets        19.11%

"Since the percentage of gain attributable to collapsible assets is 80.89%, Section 341(a) (2) does not operate to remove the taxpayers from the ambit of Section 341."

Plaintiffs contend that this tabulation is erroneous because, among other reasons, the 30 houses in Meadowlake were an integrated project with respect to Interstate. (Assuming, as stated above, that Section 341 is otherwise applicable.)

The integrated project standard is found in Treasury Regulations, Section 1.341-2(a) (4) and Section 1.341-5(b) quoted above. In essence, the Commissioner has defined an integrated project

as one involving several properties similar in kind.

The parties have stipulated that Highland Crest was an integrated project. The defendant points to this as an excellent example of an integrated project with regard to Interstate, pointing out that Interstate planned, constructed, and sold in one transaction all 153 houses in Highland Crest under a unified plan. While conceding that Meadowlake subdivision may have been an integrated project, or a total of three integrated projects, with regard to the builder Winn-Rau, it contends that the 91 houses in Meadowlake subdivision purchased by Interstate at various times were not an integrated project with regard to Interstate for the reasons: (a) the 91 houses were purchased at 11 different dates over a period of 17 months; and (b) the houses were purchased from 3 different and unrelated parties, Deemer, Winn-Rau, and Meadowlake. A number of the houses were sold by Interstate individually to different purchasers over the entire period during which the plaintiff taxpayers held Interstate stock, with 2 sales occurring in the first tax year, 25 sales occurring in the second tax year, and 34 sales occurring in the third tax year. While there are no controlling judicial authorities on the question, it is found and concluded that the defendant is correct in its contention that the 91 houses in Meadowlake were not an integrated project with regard to Interstate. (This renders inoperative the stipulation of the parties that in the event the Court finds that the houses located in the Meadowlake Addition constituted units of an integrated project, involving several properties similar in kind within the meaning of Treasury Regulations, Section 1.341–2(a) (4), a substantial part of the taxable income to be derived from that integrated project had been realized at the time of the sale of the capital stock of Interstate.)

It is further concluded that, assuming Section 341 otherwise to be applicable, the Highland Crest property was a collapsible asset.

Therefore, it is found and concluded that the Government is correct in its contention that the percentage of the gain of the plaintiff taxpayers on Interstate stock attributable to collapsible assets is 80.89 percent, assuming Section 341 to be otherwise applicable. This conclusion renders the 70 percent limitation of Section 341(d) (2) inapplicable (upon the assumptions heretofore made).

### CONCLUSION

In view of the findings and conclusions in favor of the taxpayers under Question 1 and Question 2 above, the plaintiffs are entitled to recover in these actions. Plaintiffs are directed to submit forms of judgment on notice under the Rules of this Court.