**Martin and Celia MALINER et al.**

v.

**The UNITED STATES.**

No. 8–61.

United States Court of Claims.
June 10, 1966.

Abraham S. Guterman, Boston, Mass., attorney of record, for plaintiffs. Richard P. Streicher, New York City, of counsel.

Gilbert W. Rubloff, Washington, D. C., with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant. C. Moxley Featherston, Lyle M. Turner and Philip R. Miller, Washington, D. C., of counsel.

OPINION

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

COWEN, Chief Judge.

This is an action for the recovery of income taxes paid by the taxpayers for the tax years 1951 and 1953. During those years, each plaintiff (or his or her spouse) was a stockholder of Wemberly Gardens Corporation (hereinafter referred to as Wemberly Gardens), a New York corporation.

The sole issue presented in this suit is whether Wemberly Gardens was a "collapsible corporation" as defined in Section 117(m) of the Internal Revenue Code of 1939 (26 U.S.C. § 117(m) (1952 ed.)), so as to render gains realized by each plaintiff-stockholder from corporate distributions made in 1951 and 1953 taxable as ordinary income.

The distributions at issue were made out of surplus mortgage funds obtained for the construction of an apartment house project. On November 16, 1951, an aliquot distribution of $1,745 per share was made to the common stockholders of Wemberly Gardens, and on January 30, 1953, a further distribution of $260 per share was made in the same manner. Plaintiffs reported the income as long-term capital gains. The Commissioner of Internal Revenue assessed deficiencies, treating the gains as ordinary income on the ground that the corporation was "collapsible" within the meaning of Section 117(m). Plaintiffs paid the deficiencies, plus interest, and sue here for refunds.

The origin of the tax avoidance device known as the "collapsible corporation" and the considerations which induced Congress to enact Section 117(m) of the 1939 Code have been discussed in Tibbals v. United States, Ct.Cl., 362 F.2d 266,

decided this day, and need not be repeated here.[1]

Section 117(m) provides in substance that gain from the sale or exchange of stock in a collapsible corporation is to be treated as ordinary income if, in the absence of the Section, the gain would be considered a gain from the sale or exchange of a capital asset held for more than 6 months. To the extent here relevant, a collapsible corporation is defined as one formed or availed of principally for the construction of property with a view to a distribution to its shareholders before the corporation realizes a substantial part of the net income to be derived from the property and such shareholders realize a gain attributable to the property.

The applicable Treasury Regulation, Section 29.117–11(b), provides that the statutory requirements for imposition of its provisions are satisfied where the view to a distribution is contemplated "unconditionally, conditionally, or as a recognized possibility" by those persons in a position to determine the policies of the corporation. The regulation also provides that if the distribution is attributable to circumstances present at the time of construction, the corporation shall, in the absence of compelling facts to the contrary, be considered to have been formed or availed of with a view to the action described in the statute.

The question involved here has been litigated extensively. It has been held that the term "collapsible" applies to distributions from corporations which are not simply temporary devices that are liquidated within a short time of their organization, Glickman v. Commissioner of Internal Revenue, 256 F.2d 108 (2d Cir. 1958); Burge v. Commissioner of Internal Revenue, 253 F.2d 765, 74 A.L.R.2d 664 (4th Cir. 1958); that the word "principally" does not modify the phrase "with a view to" so as to restrict the operation of the statute to situations in which the proscribed objective was uppermost in the shareholder's mind, Weil v. Commissioner of Internal Revenue, 252 F.2d 805 (2d Cir. 1958); that the view which brings the statute into operation may exist at any time prior to the completion of the construction, Jacobson v. Commissioner of Internal Revenue, 281 F.2d 703 (3d Cir. 1960), and that the requisite view is met where one of the collapsible events specified in Section 117(m) derives from circumstances which are present or which could reasonably be anticipated during the construction period, Mintz v. Commissioner, 32 T.C. 723, aff'd 284 F.2d 554 (2d Cir. 1960). Furthermore, the Supreme Court has determined that the statute applies when the requisite factors coalesce despite an absence of tax avoidance purposes. In Braunstein v. Commissioner of Internal Revenue, 374 U.S. 65, at page 71, 83 S.Ct. 1663, at page 1666, 10 L.Ed.2d 757 (1963) the Supreme Court stated:

> It is our understanding, in other words, that Congress intended to define what it believed to be a tax avoidance device rather than to leave the presence or absence of tax avoidance elements for decision on a case-to-case basis.

▮ After a full trial in this court, Commissioner William E. Day found the following facts relative to the application of Section 117(m):

> 39. Wemberly Gardens was availed of for the construction of an apartment house with a view towards making a distribution to the plaintiffs, prior to the realization by Wemberly of a substantial part of the net income to be derived from the apartment house.

> 40. This view mentioned in finding 39 existed at a time prior to the completion of the construction of the project.

Since the plaintiffs have failed to make the showing required to overcome the

1. For a statement regarding the use of the collapsible corporation in the construction industry in situations where the mortgages insured by the FHA substantially exceeded costs of construction, see Freeman, Collapsible Corporations, 11 N.Y.U.Inst. 408 (1953).

presumption of correctness accorded the trial commissioner's findings by our Rule 66, we have adopted his findings. After a study of the record, we have concluded that the adopted findings are amply supported by the evidence and effectively preclude recovery by plaintiffs in this action.

The plaintiffs are children (or spouses of children) of the Rosenberg brothers, Isaac and Fisher. Fisher Rosenberg died in 1957. The brothers had been active in various real estate enterprises since 1920 and were engaged primarily in the business of constructing, renting and operating apartment houses. In 1946 or 1947 they, along with a business associate acquired 30 lots in Jackson Heights, Queens County, New York. Initially, it had been the intention of the parties to construct an apartment house on the land to be financed by a conventional mortgage loan. Upon enactment of Section 608 of the National Housing Act of 1948, the brothers considered the desirability of obtaining a mortgage loan insured by the Federal Housing Administration. They felt that the insured loan would be preferable to a conventional loan because the interest rate would be lower, the repayment period longer, and the amount of the loan greater. Their associate parted company with them over fears that FHA control would adversely affect the profitable operation of the project. On April 13, 1949, the brothers filed with the FHA an "Application for Mortgage Insurance."

The plans called for a six-story brick apartment building containing 210 family units. The estimated requirements for construction set forth in the application were prepared by the brothers and their architect. The estimated construction cost for the buildings and garages, plus builder's and architectural fees as stated, was $1,931,562. The total estimated requirements listed by the Rosenbergs, including carrying charges, legal and organization expenses, and the cost of the land, amounted to $2,280,000. This sum was, as subsequently revealed at trial, inflated in several respects. The build-

er's fee was scheduled at $81,250, but the Rosenbergs did not intend to pay that much since they planned to supervise the construction themselves at a cost which ultimately totaled only $30,000. The architect's fee was estimated at $85,312, but the Rosenbergs had an agreement with the architect for a fee of $25,000. The mortgage amount as stated in the application was $1,836,000. After analysis of the application, the FHA issued to the Jamaica Savings Bank of New York a "Commitment for Insurance," wherein FHA agreed to insure the mortgage loan in the amount of $1,826,800 for construction of the Jackson Heights project.

With the mortgage loan agreement in hand, the brothers organized Wemberly Gardens on January 27, 1950, to construct, own, and operate the project. Of the authorized capital stock in the corporation, the 100 shares of preferred stock, par value $1, per share, were acquired by FHA while the brothers retained the 100 shares of no-par-value common stock. About June 12 of the same year, they transferred the common stock to their children, plaintiffs in this suit.

At all times during construction, the brothers supervised and controlled the operations of Wemberly Gardens. With their attorney, they constituted the board of directors and officers of the corporation.

In the mortgage agreement entered into with the Jamaica Savings Bank, the brothers had listed the various estimated construction costs in a "Trade Payment Breakdown" (FHA Form 2636). Despite the fact that firm contracts had been entered into with various building suppliers and materialmen for the purchase of services and supplies, the Trade Payment Breakdown included some figures which substantially exceeded the contract prices. For example, the contract for elevators, dated February 8, 1950, was for $43,750, yet the listed price was $52,500. Similarly, the contract for gas ranges, dated February 3, 1950, was for $11,340, while the listing for ranges

was $15,750. No explanation was given at the trial for these variations. The total estimated cost of on-site construction, exclusive of fees, as listed in the Trade Payment Breakdown was $1,702,030. The total expenses actually incurred amounted to $1,708,726.38 and included the cost of the land, all improvements, builder's and architectural fees, carrying charges and financing, and legal and organization fees. The actual cost of the physical construction was $1,452,097. Thus, the amount of the mortgage loan ($1,826,800—issued to cover physical construction) was $374,703 more than the construction cost and exceeded all costs by $118,074. It was the latter amount which was distributed as surplus on November 16, 1951, and January 30, 1953.

All five units of the apartment building were completed and ready for occupancy before July 1, 1951. However, some minor construction work, consisting mainly if not entirely of landscaping, was performed thereafter during the summer. The record does not show exactly when all work was completed. By November 1, 1951, all the apartments had been rented.

During the construction of the project, the Rosenbergs exercised full control and supervision of the construction and handled all details of the financial accounts. At all times, they were fully apprised of the status of the construction, the amount of outstanding obligations, the balance of funds available from the mortgage loan and all other matters connected with the construction of the building and the payment of accounts. Without more, it seems unescapable that the brothers knew at some time prior to the completion of the construction that there would be a substantial sum available to Wemberly Gardens after all costs of the project had been satisfied. But the latter part of 1950 and the year 1951 were not normal times. With the Communist sweep through South Korea, the Korean hostilities began. During World War II, the Rosenberg brothers had operated about a dozen apartment houses and had faced spiraling construction costs, material shortages, labor scarcities, restrictive governmental regulations, and rental problems in the construction and operation of their properties. As construction on Wemberly Gardens proceeded, the brothers became concerned that the Korean situation would have a similar effect on their operations.

To some extent, the problems they encountered during World War II rose again to confront the Rosenbergs. The demand for materials caused the prices of certain construction items to increase and shortages existed. To avoid undue delays in certain segments of construction, the Rosenbergs acceded to the demands of some materialmen and subcontractors and voluntarily increased existing contract prices. Substitutions became necessary for some materials which were totally unavailable. Delays in the delivery of building supplies occurred, labor shortages developed, and a New York statute was passed permitting a person entering military service to terminate his lease.

At the height of their concern over the Korean impact on their project, the board of directors of Wemberly Gardens (the Rosenbergs and their attorney) met and authorized the issuance of $200,000 of debentures, due in 10 years and bearing an interest rate of 1 percent per annum, to cover any unexpected contingencies. This action took place on December 1, 1950. Of the authorized debentures, only $55,000 worth were actually purchased and those purchases were made by a corporation owned and controlled by the Rosenbergs. Repayment of the debentures was made on September 27, 1951.

Plaintiffs have cited no case in support of their position and do not appear to dispute the legal basis for treating the distributions they received as ordinary income, if the distributions had occurred under normal economic conditions. However, they contend that in the light of the Rosenbergs' adverse experience during World War II and the wartime conditions which prevailed during and

after the construction of the Wemberly Gardens project, it is against the weight of the evidence to conclude that the Rosenbergs held a view to distribution during construction. They argue that the apprehensions which the brothers entertained as a result of the conditions created by the Korean conflict negates the existence of the necessary view to a distribution of the surplus.

The weakness in plaintiff's position is that it places the true picture out of focus. We begin with the unchallenged fact that the Rosenbergs had obtained a mortgage loan considerably in excess of all anticipated costs and had started construction of the project before the Korean conflict erupted. Although plaintiffs gloss over this fact, we think it significant that construction of the project began with a built-in surplus. Therefore, we do not doubt that, at that time, they possessed a view toward making a distribution to the stockholders. However, we have found that the construction problems generated by the Korean hostilities caused the brothers to be seriously concerned about the adequacy of their financing during the latter portion of 1950 and for sometime during 1951. Indeed, the distributions that were made to the stockholders would undoubtedly have been much greater except for the wartime increases in cost. There was, therefore, a period of time in which the Rosenbergs did not feel sure that the surplus loan proceeds could be distributed. The decisive fact, however, is that the increases in contract prices and other construction problems resulting from the Korean situation occurred while the project was still in the process of construction. The evidence justifies the inference that by June 1, 1951, when the first two units of the apartment were ready for occupancy, the fears previously entertained by the Rosenberg brothers had been considerably allayed. By June 26, 1951, when the city of New York issued a final certificate of occupancy and before all construction had been completed, the Ro-

senbergs knew or should have known that a substantial surplus would be available for distribution to the stockholders. At the least, we are satisfied that before the project was completed, they recognized the possibility of a distribution of the surplus and, under the provisions of the Treasury Regulations, such a finding is sufficient to bring the distributions within the purview of Section 117(m). The events that followed in rapid succession after the project was completed lead to that conclusion. On September 27, 1951, a short time after construction had been completed, the $55,000 of debentures sold on December 18, 1950, were repaid. By November 1, 1951, all of the apartments had been rented. Hard on the heels of that occurrence and during the same month, the board of directors of Wemberly Gardens had the project revalued to create the revaluation surplus that was a prerequisite to a distribution to the stockholders. The first and larger distribution to the stockholders was made on November 16, 1951, long before the corporation had realized a "substantial part of the net income to be derived" from the project.

Faced with the formidable factual obstacles recited above, plaintiffs have made an additional contention. Despite the fact that the surplus on hand at the time construction was completed was considerably more than enough to pay all the costs incurred on the project, including the cost of the land, they maintain that the Rosenbergs still believed that Wemberly Gardens would need every dollar it had to carry on the project. That belief, they say, was grounded on the apprehension that rent controls, the New York statute permitting persons in military service to terminate their leases, and the probability of a substantial vacancy rate would mean that the income from the apartments would not cover expenses, plus debt service. A number of newspaper articles were admitted in evidence to show the state of mind of the Rosenbergs during the pertinent period. In explanation of the speed with which

the first distribution was made following full occupancy of the apartments, plaintiffs say that the Rosenbergs interpreted the newspaper accounts as showing that, by November 1, 1951, the prospect of peace in Korea was in sight. With that turn of events, they declare that the fears of the Rosenbergs that they would be unable to rent the project were dispelled. Their brief states that "the cessation of hostilities in Korea, which would have required a prophet to foretell during construction, was the immediate cause of the distribution." The persuasiveness of that argument is considerably diminished by the fact that the newspaper account, which allegedly assured the Rosenbergs the conflict had ended, was not published until November 23, 1951, a week after the first distribution to the stockholders. Moreover, we take notice of the fact that significant action between the combatants in Korea continued into the latter part of 1952 and that the armistice was not signed until July 27, 1953.

In any event, plaintiffs have not established the existence of the facts upon which the Rosenbergs allegedly based their belief, prior to the completion of the project, that the apartment rentals would not be sufficient to pay estimated expenses and debt service. There is no evidence to show that Wemberly Gardens lost any tenants as a result of the wartime law protecting tenants in military service. The record does not support the claim that a substantial number of vacancies existed prior to November 1, 1951, or that the rental experience for the project was other than normal prior to that time. Consequently, plaintiffs have not shown that before construction was finished, the occupancy rate threatened to be less than the minimum carrying charges, or that all or most of the surplus loan proceeds would be needed to sustain operations if such adverse conditions arose.

In summary, plaintiffs have not carried their burden of proving that the corporation was not formed or availed of with a view to making a distribution to its shareholders prior to a realization by the corporation of a substantial part of the net income to be derived from the apartment project. Therefore, plaintiffs' petition is dismissed.